Estate of Mary Chesnut Budd, J. T. Budd, Jr., Executor v. Commissioner.
Estate of Mary Chesnut Budd v. Commissioner
Docket No. 112340.
United States Tax Court
1945 Tax Ct. Memo LEXIS 171; 4 T.C.M. (CCH) 601; T.C.M. (RIA) 45192; June 7, 1945
*171 1. In 1937 the decedent, at the age of 78 and within ten months prior to her death, transferred 600 shares of stock representing approximately ealf of her estate, to her three children and two granddaughters. She had been in ill health for the preceding ten years. Held, that the statutory presumption that the transfers were made in contemplation of death has not been overcome. 2. Respondent's valuation of the gross estate of decedent sustained. 3. Deductions from gross estate of attorney fees incurred in the present proceeding not allowed. James Whitehurst, Esq., for the petitioner. Bernard D. Hathcock, Esq., for the respondent. TYSON Memorandum Findings of Fact and Opinion Respondent determined a deficiency in estate tax against the *172 estate of Mary Chestnut Budd in the amount of $11,649.99, resulting in part from (1) respondent's inclusion, under section 302(c) of the Revenue Act of 1926 as amended, in decedent's gross estate of the amount of $80,775 as the value on the date of decedent's death August 15, 1938 of shares of stock transferred by the decedent on October 19, 1937 and determined by respondent to have been transfers made in contemplation of death, (2) respondent's additions to the value of the gross estate by reason of his determination as to the fair market value of certain other shares of stock at date of death. Petitioner contests this action of respondent. Petitioner, for the first time, on brief, requests the allowance of additional expenses in an undisclosed amount as a deduction from the gross estate, such expenses being those incurred "for representation in the matter of this proposed additional assessment of estate tax". Findings of Fact The petitioner is the executor of the estate of Mary Chesnut Budd, and resides at Quincy, Florida. The estate tax return was filed with the collector for the district of Florida. The decedent, who was also a resident of Quincy, died August 15, 1938, at *173 the age of 78 years, 10 months, and 23 days. Decedent at the time of her death was a widow. She was the mother of five children, a son, J. T. Budd, Jr., and four daughters, Elizabeth Budd Ball, Katie Budd Homes, Josephine Budd Jordan, and Millie Hale Budd. Millie Hale Budd died in infancy. Josephine Budd Jordan died in December 1935 and left surviving her a husband, Norman B. Jordan, and two children. Joan Elizabeth Jordan and Josephine Barbara Jordan. Approximately ten months prior to her death, decedent, on October 19, 1937, made transfers of 600 shares of Coca-Cola Company common stock to donees as follows: Number of
Donee
Relationship
Shares
J. T. Budd, Jr.
Son
150
J. T. Budd, Jr., Trustee for Elizabeth Budd Ball under trust agree-
ment dated October 19, 1937
Daughter
150
Katie Budd Holmes
Daughter
150
Joan Elizabeth Jordan
Granddaughter
75
Josephine Barbara Jordan
Granddaughter
75
J. T. Budd, Jr. had financial difficulties in 1934, but purchased a 1/2 interest in a cigar business on credit. His financial status in 1937 was not good. Elizabeth Budd Ball had been married, but was separated from her husband. Since the separation and *174 for about 14 years preceding decedent's death she lived with the decedent, who supported her. The decedent continued so to support her after the transfers involved herein until the time of decedent's death. Katie Budd Holmes was married to a retired Presbyterian minister. She worked in an abstract company to help support herself and husband. At the time of the foregoing transfers Norman B. Jordan, father of Joan Elizabeth Jordan and Josephine Barbara Jordan, was the executive vice-president and cashier of the Quincy State Bank, Quincy, Florida, and had sufficient financial resources to maintain his two daughters. The decedent suffered from spinal arthritis for about ten years before she died. She went to Warm Springs, Virginia and various other places for treatment and relief from the severe pain occasioned by this ailment and worried a good deal about it. In April 1935 decedent complained of pain in the right lumbar region. On June 23, 1935, she entered the John D. Archbold Memorial Hospital (hereinafter sometimes called Memorial Hospital), Thomasville, Georgia, where, she being found to have inflammation of the gall bladder with gall stones, her gall bladder was removed. *175 She remained in the hospital until July 14, 1935 when she was discharged. The hospital record showed at that date, "Result at discharge - Cured." On returning to her home in Quincy, she made the following repairs and improvements on the house in which she lived: installed an oil heating system, put a new roof on the house, papered and painted it throughout, and did some repair work underneath the house. Decedent returned to the hospital on July 23, 1935 for treatment as an "out-patient" as "No relief of complaints" followed removal of the gall bladder. X-ray films made at that time showed a "marked calcification of the abdominal aorta," in addition to spinal arthritis. The 'abdominal aorta" is the abdominal section of the large artery leaving the heart. "Calcification" thereof refers to calcified deposits that occur in the walls of the artery. On February 4, 1936, decedent entered Wesley Memorial Hospital, Emory University, (hereinafter sometimes called Wesley Hospital), Atlanta, Georgia. The hospital records show that she complained of "Pain in rt. side - 'colon trouble,' Weakness on exertion, Rheumatism." The records further show "mental depression, or mild melancholia" and state. *176 "For past six years she has had arthritis especially of both feet & marked deformity of toes. She also has lumbo-sacral arthritis from which she suffers considerably. She has received almost every conceivable type of treatment from Sulphur INI to vaccines, diathermy, etc., and has recently completed a course of hot colonic irrigations & no improvement. She has grieved considerably for past month due to the sudden death of a daughter from a heart attack. Her daughter was accompanying her on the way to see a Dr. when she had the attack and was with her when she died. It seems that she was particularly fond of this daughter and since then she has had almost no interest in things about her. Since this time she has had some anorexia and has lost a slight amount of weight as well as complaining of weakness upon slightest exertion." She was discharged from Wesley Hospital on February 13, 1936, the hospital record showing "Result Improved." Decedent again entered the John D. Archbold Memorial Hospital on September 28, 1936. The hospital record states: "Present Illness. Pain in rt. side persists in spite of removal of gall bladder and treatment of 11 doctors." The diagnosis made was "Spinal *177 Arthritis." The hospital record for October 5, 1936 states: "Despondent at times. Worries about cancer." The same record of October 11, 1936 states: "Pt. (Patient) dismissed little if any improved." Decedent told the nurse who always attended her whenever she was a patient at the Memorial Hospital that after she lost her daughter, "she did not care to live because Josie had passed away." Decedent returned to Memorial Hospital on July 1, 1938. The hospital record states: Filing Diagnosis - Spinal Arthritis - (osteoarthritis). Complications - Coronary arterio sclerosis, myocardial insufficiency. Operations or treatment - medical. Discharge date - 8-14-38 Result at discharge - Imp. A few days before August 14, 1938 decedent had a severe heart attack and on August 14, 1938, was taken home in an ambulance and died the following day. Decedent made her last will and testament May 11, 1936. Aside from minor bequests to servants, she placed in each of two trusts the sum of $1,000 for the respective use and benefit of her two daughters, Katie Budd Holmes and Elizabeth Budd Ball, the income to be paid them for life, and the principal to be paid them in the event the trustee "may *178 deem it necessary." Any undistributed balance of principal held for Katie, was to go at her death to decedent's granddaughter, Mary Budd Holmes. Any undistributed balance of principal held for Elizabeth should be distributed at her death, 1/2 to decedent's son and 1/4 to each of her granddaughters, Josephine Barbara Jordan and Joan Elizabeth Jordan. The residue of her estate was to be divided as follows: Daughter, Katie Budd Holmes
7/24
J. T. Budd, Jr., in trust for daughter,
Elizabeth Budd Ball
7/24
Son, J. T. Budd, Jr.
7/24
Granddaughter, Josephine Barbara Jordan
1/16
Granddaughter, Joan Elizabeth Jordan
1/16
Respondent determined that the fair market value at date of decedent's death, of the 600 shares of common stock of Coca-Cola Company transferred by her on October 19, 1937, was $80,775, and that the value of the gross estate was $154,453.66. He also increased the "Returned" valuation of two capital stock items (issuing corporation not named) as follows: Returned
Determined
Item 2
$ 5,250.00
$ 5,900.00
Item 3
27,500.00
53,850.00
"After consideration of earnings, book value, dividend paying capacity, sales of capital stock, *179 and other pertinent facts the value of the foregoing items is determined at $108 per share for item 2 and $1,077 per share for item 3." The transfers of 600 shares of Coca-Cola Company stock made on October 19, 1937 by the decedent were made in contemplation of death. Opinion TYSON, Judge: The first issue presented for determination is whether 600 shares of Coca-Cola stock transferred by decedent approximately ten months before her death for the benefit of her children and certain grandchildren, were transfers made in contemplation of death within the meaning of section 302(c) of the Revenue Act of 1926 as amended, and therefore to be included as part of her gross estate. The statute provides that transfers made within two years prior to death "shall, unless shown to the contrary, be deemed to have been made in contemplation of death * * *." The decedent died at the age of 78 years and ten months. For ten years she had suffered from spinal arthritis. She traveled numerous places for treatment and worried a great deal about the severe pain. Her personal physician testified that the "thing doesn't kill you, but you wished it would sometimes". On June 23, 1935, she was found at *180 the Memorial Hospital to have inflammation of the gall bladder and gall stones. Her gall bladder was removed and on July 14, 1935, she was discharged as cured. She returned to the hospital as an "out-patient" for treatment nine days after discharge, because not relieved of her "complaints". In February 1936 she entered the Wesley Hospital in Atlanta, Georgia, complaining of "Pain in rt. side - 'colon trouble', Weakness on exertion, Rheumatism". The hospital record shows, as to decedent's condition, "mental depression, or mild melancholia". The record also shows that she was grieving considerably over the recent sudden death of her daughter from a heart attack while accompaning decedent. That record shows that "since then she has had almost no interest in things about her". In September 1936 she again entered the Memorial Hospital at Thomasville, Georgia. Its records show that her pain persisted despite "treatment of 11 doctors", that she is "Despondent at times. Worries about cancer". The decedent told the nurse who attended her that after she lost her daughter, "she did not care to live because Josie (her daughter) had passed away". Decedent was dismissed from this hospital October 11, 1936, "little *181 if any improved". Decedent made her last will and testament May 11, 1936. On October 19, 1937, decedent made the transfers of 600 shares of stock, 150 shares each to her son and her daughter, Katie, 150 shares in trust for her daughter, Elizabeth, and 75 shares each to two grandchildren. Decedent returned to the hospital July 1, 1938, and after having a heart attack was discharged August 14, 1938 and died the following day. The Supreme Court in , said: It is contemplation of death, not necessarily contemplation of imminent death, to which the statute refers. It is conceivable that the idea of death may possess the mind so as to furnish a controlling motive for the disposition of property, although death is not thought to be close at hand. Old age may give premonitions and promptings independent of mortal disease. Decedent's experience during the last ten years of her life was a history of severe pain and frustrated efforts at relief. Mental depression, melancholia, despondency, and the shock of her favorite daughter's death from heart failure in decedent's presence undoubtedly gave decedent "premonitions and promptings independent *182 of mortal disease". And to these her apprehensions as to cancer, and the existence of a motive "in contemplation of death" would appear abundantly established. This conclusion is fortified by the fact that the transfers exceeding in value half her gross estates as determined by respondent, were made after her will was executed, and such transfers disposed of the stock to the same natural objects of her bounty as did the will. Cf. . ; ; and . Petitioner contends that decedent's motives in making the gifts were associated with life, rather than with death, because she "was first prompted to make the gifts by the desire, while she was living, to provide an independent trust estate for her daughter, Elizabeth B. Ball, and to lay the foundation for an independent estate and income for her two grandchildren, Joan and Josephine Jordan; and to aid her son, J. T. Budd, Jr. over his financial difficulties; and also to assist her daughter, Mrs. Holmes, whose husband was a retired *183 Presbyterian minister and whose income had been reduced to practically nothing". There is nothing in the record to sustain these contentions, except the following circumstances which we will now discuss. Taking the contentions in order, we find that the daughter, Elizabeth Budd Ball, had been supported by decedent for many years prior to the gift and that she continued to receive such support thereafter until decedent's death. Decedent's son-in-law testified that "she wanted to see that her daughter would be amply looked after and she didn't have enough means to support her ownself". Mrs. Ball was being amply looked after and supported by decedent while decedent was living and had been for about 14 years. Lack of means to support herself was an important contingency to Mrs. Ball only in the event of decedent's death. No circumstance, therefore, is shown as an acceptable motive why this gift should have been made on October 9, 1937 rather than at any time in the preceding 14 years. As to the grandchildren, Joan and Josephine Jordan, no evidence was offered as a reason for the gifts to them. Petitioner concedes that their father, a banker, was amply able to take care of them. As to *184 the son, his financial crisis occurred in 1934, three years before the gift was made. The time when his condition called for relief would seem to have been in 1934, if at all. No reason is suggested for the delay therein until October 1937. There is likewise no explanation why the gift to the daughter, Katie, (Mrs. Holmes) was made at the particular time when it was made. There is evidence that she, as do many other wives, worked to help support herself and husband. There is no evidence of any critical need at that time or of any greater need than may have existed in preceding years. No sufficient circumstances appear as showing an acceptable motive for any of these transfers other than the cumulative effect at about that time of decedent's many disappointments in her pursuit of health, her melancholia and despondency, her fear of cancer, and a general attitude of mind inviting contemplation of death. What was said in , respecting a gift asserted to be for the relief of a daughter's financial distress, is applicable to this entire group of gifts, * * * No effort is made to account for the bestowal of so large and unusual a generosity *185 at that particular time. Petitioner argues that the fact decedent made extensive repairs on her home in 1935 is "strong indication that she did not have any expectation or anticipation of death within the immediate or reasonably near future". Aside from the fact that a motive in contemplation of death may exist "although death is not thought to be close at hand", , we are not, under the circumstances of this case, concerned with decedent's state of mind or attitude toward life and death in 1935, more than two years before the gifts were made. Subsequent to the time of the repairs and before the gifts were made she went to a hospital three times, her favorite daughter died suddenly in her presence, and because of the loss of the daughter she expressed the sentiment "that she did not care to live". We are of the opinion that the statutory presumption of contemplation of death and the presumption of correctness of the respondent's determination have not been overcome by the evidence. The respondent's determination is therefore sustained on the first issue. The petition herein assigns no error with respect to respondent's valuation of the *186 600 shares of Coca-Cola stock at $80,775, but does assign error as to his valuation of certain Coca-Cola International Corporation common stock returned as part of the decedent's gross estate. On brief, however, petitioner attacks both valuations, and states: The facts as to the organization and corporate history of the Coca-Cola Company and Coca-Cola International Corporation, together with the facts as to the earnings, dividend payments and value of tangible and intangible assets of both Companies are set forth in considerable detail in the statements submitted with the estate tax return filed by the Executor * * *. Therefore, this brief will be confined to a summary of the more pertinent facts relating to each Company as set forth in the statements submitted with the return, supplemented by additional facts which should be taken into consideration in determining the value of the stock in question. Neither the estate tax return nor the statements nor "any additional facts" referred to were put in evidence. No evidence of any kind was submitted with reference to the value of the stocks in question. The determination of the respondent with reference thereto is presumptively correct *187 and is therefore sustained as to the second issue, because of petitioner's failure of proof. Petitioner requests, on brief, that an allowance be made as a deduction from the gross estate, of an undisclosed amount of expenses "incurred or to be incurred for representation in the matter of this proposed additional assessment of estate tax". There was no assignment of error or proof offered covering this point, so we express no opinion with reference thereto. The respondent will doubtless allow such of those expenses as are proper. Decision will be entered under Rule 50.